# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 15, 2007         Decided June 1, 2007

No. 06-1023

NATIONAL ASSOCIATION OF CLEAN AIR AGENCIES,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

On Petition for Review of a Final Action of the
Environmental Protection Agency

*Emma E. Garrison* argued the cause for petitioner. With her on the briefs was *Hope M. Babcock*.

*Steven E. Rusak*, Attorney, United States Department of Justice, argued the cause for respondent. With him on the brief were *John C. Cruden*, Deputy Assistant Attorney General, and *Michael W. Thrift*, Counsel, U.S. Environmental Protection Agency.

*David A. Berg*, *Mac S. Dunaway*, and *Thomas Richichi* were on the brief for *amici curiae* Air Transport Association of America, Inc. and Aerospace Industries Association in support of respondent.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* Edwards.

EDWARDS, *Senior Circuit Judge*: The Environmental Protection Agency ("EPA") issued a final rule increasing the stringency of the oxides of nitrogen ("$NO_x$") emission standards applicable to newly certified commercial aircraft gas turbine engines under § 231 of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7571. *See Control of Air Pollution From Aircraft and Aircraft Engines; Emission Standards and Test Procedures*, 70 Fed. Reg. 69,664 (Nov. 17, 2005) ("Final Rule"). Arguing that the Final Rule did not go far enough, the National Association of Clean Air Agencies ("NACAA"), a national trade association that represents state and local governmental agencies responsible for achieving and sustaining clean air, petitions for review. Specifically, NACAA argues that EPA's interpretation of the Act – that § 231 does not require the agency to subordinate all other concerns to emissions reduction and reach a "technology-forcing" result – constitutes an impermissible construction of the Act. Petitioner also argues that the Final Rule is arbitrary and capricious because it relies upon an insufficient time rationale, fails to establish a firm timeline for tightening standards in the future, considers safety concerns with little explanation, and departs from EPA's practice of setting production cut-off dates. EPA defends the Final Rule and argues that NACAA lacks standing to challenge it.

Although we conclude that NACAA has standing, we find no merit in the petition for review. We hold that EPA's interpretation of § 231 is not manifestly contrary to the CAA and that the agency did not otherwise act arbitrarily and capriciously in promulgating the Final Rule. Most of the arbitrary and capricious claims raised by NACAA are not properly before the court, because they were never raised with

EPA. NACAA's preserved claim that the Final Rule departs from EPA's practice of setting production cut-off dates lacks merit because the Final Rule provides a reasoned explanation for the agency's change in course. Because we find that none of NACAA's claims are meritorious, we deny the petition for review in all respects.

## I. BACKGROUND

The Clean Air Act establishes "a joint state and federal program for regulating the nation's air quality." *Envtl. Def. v. EPA*, 467 F.3d 1329, 1331 (D.C. Cir. 2006) (internal quotation marks omitted). The CAA requires EPA to promulgate, review, and revise National Ambient Air Quality Standards ("NAAQS"), specifying maximum levels of certain air pollutants in the ambient air. *See* 42 U.S.C. § 7409. "States, in turn, are required to adopt State Implementation Plans ('SIPs') that 'provide[] for implementation, maintenance, and enforcement of [NAAQS] . . . .'" *Envtl. Def.*, 467 F.3d at 1331 (quoting 42 U.S.C. § 7410(a)(1)). "States that fail to comply with th[is] requirement[] are subject to various sanctions . . . ." *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1037 (D.C. Cir. 2001) (per curiam) (citing 42 U.S.C. § 7509).

Section 231 of the CAA requires the Administrator of EPA to study and investigate emissions of air pollutants from aircraft, considering such emissions' effect on air quality and the "technological feasibility" of controlling them. 42 U.S.C. § 7571(a). The Administrator shall then, "from time to time, issue proposed . . . standards applicable to the emission of any air pollutant from . . . aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7571(a)(2)(A). After holding public hearings, the Administrator must "issue such regulations with such modifications as he deems appropriate." *Id.* § 7571(a)(3). Section 231 also authorizes the Administrator to revise such

regulations "from time to time," but mandates that he "not change the . . . standards if such change would significantly increase noise and adversely affect safety." *Id.* § 7571(a)(2)(B), (a)(3); *see also id.* § 7571(c) (establishing additional procedure focused on aircraft safety). Furthermore, "[a]ny regulation prescribed under [§ 231] . . . shall take effect after such period as the Administrator finds necessary . . . to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." *Id.* § 7571(b). This power to set standards resides in EPA alone: "No State or political subdivision thereof may adopt or attempt to enforce any standard respecting emissions of any air pollutant from any aircraft or engine thereof unless such standard is identical to [the federal] standard." *Id.* § 7573.

EPA does not regulate on a blank slate. "[B]y virtue of being a party to" the Chicago Convention on International Civil Aviation, Dec. 7, 1944, 61 Stat. 1180, 15 U.N.T.S. 295, the United States is a member of the United Nations International Civil Aviation Organization ("ICAO"). *Wardair Canada Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 9-10 (1986). "As long as a participating nation . . . adopts [domestic] aircraft emission standards that are equal to or more stringent than ICAO's [environmental] standards," aircraft belonging to that nation "are permitted to travel through the airspace of other countries without any restriction." Final Rule, 70 Fed. Reg. at 69,667. But any one of the approximately 190 contracting nations "can ban use within its airspace of any aircraft that does not meet ICAO standards." *Id.* In 1981, ICAO first adopted standards governing emissions of $NO_x$, a precursor to the formation of ozone and cause of acid rain, eutrophication, plant damage, and visibility impairment. *Id.* at 69,667-68, 69,672-73. In 1993, ICAO approved a proposal to tighten the 1981 ICAO standards by 20%. *See id.* at 69,667. EPA altered its regulations to adopt the 1993 ICAO standards in 1997. *Id.* ICAO approved an additional 16% $NO_x$ reduction in 1999. *Id.*

On September 30, 2003, approximately three months before the 1999 ICAO standards were set to take effect, EPA published a notice of proposed rulemaking declaring its intent to "adopt standards equivalent to the [1999] $NO_x$ standards of [ICAO], and thereby bring the United States emission standards into alignment with the internationally adopted standards." *See Control of Air Pollution From Aircraft and Aircraft Engines; Emission Standards and Test Procedures*, 68 Fed. Reg. 56,226, 56,226 (Sept. 30, 2003) ("NPRM"). After EPA held a public hearing on the NPRM and after the close of the written comment period, ICAO again lowered permissible $NO_x$ emissions, this time by approximately 12%, and slated the new standards to take effect after December 31, 2007. Final Rule, 70 Fed. Reg. at 69,677. The Final Rule, issued in November 2005, amends EPA regulations to reflect the 1999 ICAO standards (a 16% reduction from the previous EPA standards), not the more stringent reduction approved by ICAO during the pendency of the rulemaking. *Id.* at 69,667, 69,677.

The Final Rule recognizes that the new standards "will not impose any additional burden on manufacturers," because "94 percent of all engine models currently in production already meet the [1999 ICAO] standards." *Id.* at 69,675. The Final Rule also acknowledges ICAO's 2005 standards and states that "[m]ore stringent standards . . . will likely be necessary and appropriate in the future." *Id.* at 69,676-78. But it reasons that "assess[ing] the costs (and emission benefits) of more stringent standards" would have required additional time that EPA did not then have "since [it had] already gone past the implementation date of the [1999 ICAO] standards." *Id.* at 69,675, 69,677-78. The Final Rule ultimately justifies its adoption of the 1999 ICAO standards as "aimed at assuring that . . . progress is not reversed in the future" and as part of an "ongoing phased approach . . . to address[ing] emissions from aircraft engines." *Id.* at 69,675-77.

In a similar vein, the Final Rule extends the 1999 ICAO standards only to newly certified engine models, not to newly manufactured engines of already certified models. *Id.* at 69,678. Although the Final Rule recognizes that EPA has "historically adopted production cut-offs for previous standards," it distinguishes the "unique case" of aircraft engine emissions. *Id.* at 69,681. Because ICAO did not apply its 1999 standards to newly manufactured engines of already certified models, *id.* at 69,678, the Final Rule reasons that "to apply [the 16% reduction] to [those engines] (a production cut-off) could be disruptive to the production planning of engine manufacturers," *id.* at 69,680-81. Moreover, "[to] develop a record that fully analyzes the emissions benefits (if any) and the implementation costs of [wider applicability]" would "unacceptably slow down th[e] rulemaking." *Id.* at 69,681. The Final Rule concludes: "[I]n the interests of expediency and of bringing U.S. domestic law into conformity with . . . obligations under the Chicago Convention (albeit tardily), . . . the most appropriate course for now . . . is to simply update [EPA] regulations to track [the 1999 ICAO standards] in terms of both stringency levels and scope of applicability." *Id.*

The Final Rule interprets § 231 of the CAA to authorize this "ongoing phased approach":

> EPA interprets its authority under section 231 to be somewhat similar to those provisions that require us to identify a reasonable balance of specified emissions reduction, cost, safety, noise, and other factors. However, we are not compelled under section 231 to obtain the "greatest degree of emission reduction achievable" as per [other provisions of the CAA], and so EPA does not interpret the Act as requiring the agency to give subordinate status to factors such as cost, safety, and noise in determining what standards are reasonable for aircraft engines. Rather, EPA has greater flexibility under section

231 in determining what standard is most reasonable for aircraft engines, and is not required to achieve a "technology-forcing" result.

*Id.* at 69,676 (internal citation omitted). The Final Rule also notes that "there is an added emphasis [in § 231] on the consideration of safety. Therefore, it is reasonable for EPA to give greater weight to considerations of safety in this context than it might in balancing emissions reduction, cost, and energy factors under other [CAA] provisions." *Id.* (internal citations omitted). EPA promulgated the Final Rule on November 17, 2005.

On January 13, 2006, State and Territorial Air Pollution Program Administrators and Association of Local Air Pollution Control Officials filed a petition for review of the Final Rule. The two organizations have since merged to form NACAA.

## II. ANALYSIS

### A. *Standing*

At the outset, we must address EPA's contention that NACAA has failed to demonstrate standing to challenge the Final Rule, and that this court thus lacks jurisdiction to entertain the petition for review. *See Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)). "Associations such as petitioner[] have representational standing under Article III if (1) at least one of their members has standing, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005). Since EPA does not contest that NACAA satisfies "the germaneness [and] individual-participation element[s] of [representational] standing, and because 'we [too] have [no] reason to believe'" that NACAA fails to satisfy these "'latter two requirements,'"

*Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004) (per curiam) (quoting *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)), we focus solely upon whether "at least one of [NACAA's] members has standing to sue in [its] own right," *Natural Res. Def. Council v. EPA*, 464 F.3d 1, 5-6 (D.C. Cir. 2006).

"The 'irreducible constitutional minimum of standing' has three elements:  (1) injury in fact, (2) causation, and (3) redressability." *GrassRoots Recycling Network, Inc. v. EPA*, 429 F.3d 1109, 1111-12 (D.C. Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Although EPA makes a halfhearted attempt to contest the final two elements, *see* Respondent's Br. at 21 n.8, "[t]he only thing at issue in this case is the injury-in-fact prong of Article III standing, for causation and redressability are obvious if petitioner[] can demonstrate injury," *Am. Library Ass'n v. FCC*, 401 F.3d 489, 493 (D.C. Cir. 2005).  In order to demonstrate injury, "petitioner[] must show that there is a substantial probability that [EPA's Final Rule] will harm the concrete and particularized interests of at least one of [its] members." *Am. Library Ass'n*, 406 F.3d at 696 (internal quotation marks omitted).

Through references to the administrative record and an affidavit submitted with its opening brief, NACAA adequately demonstrates that, by failing to further tighten restrictions on $NO_x$, the Final Rule makes it more difficult for state air pollution control agencies to establish SIPs.  In other words, since the federal NAAQS cap the total allowable $NO_x$, when EPA allows higher $NO_x$ emissions from aircraft engines, state agencies have no choice but to impose greater restrictions on other sources of $NO_x$.  And if NACAA's member agencies fail to meet the applicable standard, their states are exposed to federal sanctions. EPA essentially concedes these facts, but disputes their jurisdictional significance, arguing that since "the burden at

most can be understood as affecting the mix of controls a State may need to impose," the Final Rule "does not require States and local agencies to do anything as regulators that they were not already directed to do." Respondent's Br. at 17-18.

We have little difficulty concluding that NACAA has satisfied the injury-in-fact requirement of Article III standing. In *West Virginia v. EPA*, petitioners sought review of EPA rules requiring various states to revise state implementation plans as to $NO_x$ emissions and establishing emission limits for major $NO_x$ sources. 362 F.3d 861, 865-67 (D.C. Cir. 2004). The effect of the rules was to lower the states' emission budgets. ("Budgets" represent the amount of allowable $NO_x$ emissions.) We found that "[t]he lower the emissions budget, the more difficult and onerous is the states' task of devising an adequate SIP." *Id.* at 868. We therefore held that the state petitioners in that case had demonstrated injury where EPA lowered states' total $NO_x$ emissions budgets, requiring states to revise their SIPs to impose additional controls. *Id.*

The standing issue in this case is controlled by our rationale and judgment in *West Virginia*. Here, by allegedly raising (or failing to lower) the emissions allocated to one source, the Final Rule requires states to impose stricter controls on emissions from other individual sources. In other words, the Final Rule makes it "more difficult and onerous" for the states to "devis[e] an adequate SIP." *Id*. Because there is a substantial probability that EPA's action will harm the interests of NACAA's state agency members, NACAA has standing to challenge the Final Rule and we have jurisdiction to consider the merits of the petition. *See also Massachusetts v. EPA*, 127 S. Ct. 1438, 1454-55 (2007) (stating that states are "entitled to special solicitude in . . . standing analysis").

**B.** *Standard of Review*

Since EPA acted pursuant to delegated authority, we review its interpretation of § 231 according to the principles enunciated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Chevron* instructs us to accord agency interpretations of statutes they administer varying degrees of deference. Under *Chevron* Step One, we always first examine the statute *de novo*, "employing traditional tools of statutory construction." *Id.* at 843 n.9. "If the intent of Congress is clear," we accord the agency's interpretation no deference, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. But if Congress "has [not] directly spoken to the precise question at issue," *id.* at 842, we proceed to *Chevron* Step Two. Under Step Two, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are . . . manifestly contrary to the statute." *Id.* at 843-44. Where a "'legislative delegation to an agency on a particular question is implicit rather than explicit,'" *INS v. Cardoza-Fonseca*, 480 U.S. 421, 445 n.29 (1987) (quoting *Chevron*, 467 U.S. 844), we must uphold any "'reasonable interpretation made by the administrator' of that agency," *Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 356 (D.C. Cir. 1993) (quoting *Chevron*, 467 U.S. at 844).

Even where EPA's construction satisfies *Chevron*, we still must ensure that its action is not otherwise arbitrary and capricious. *See* 42 U.S.C. § 7607(d)(9)(A); *see also Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004) ("[R]eview under the CAA's 'arbitrary and capricious' standard is the same as that required by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)."). The arbitrary and capricious standard is "[h]ighly deferential," and it "presumes the validity of agency

action." *AT&T Corp. v. FCC*, 349 F.3d 692, 698 (D.C. Cir. 2003) (internal quotation marks omitted). We must uphold an agency's action where it "has considered the relevant factors and articulated a 'rational connection between the facts found and the choice made,'" *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), and has not "relied on [improper] factors," *State Farm*, 463 U.S. at 43. "[T]he ultimate standard of review is a narrow one. [We are] not empowered to substitute [our] judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). And, "[w]e give particular deference to . . . EPA when it acts under unwieldy and science-driven statutory schemes like the Clean Air Act." *Bluewater Network v. EPA*, 372 F.3d 404, 410 (D.C. Cir. 2004) (internal quotation marks omitted).

## C. Chevron *Review*

There can be no doubt that EPA acted pursuant to an express delegation authority in adopting the disputed Final Rule. An express delegation arises when "Congress has expressly delegated to [an agency] the authority to prescribe regulations containing such classifications, differentiations, or other provisions as, in the judgment of the [agency], are necessary or proper to effectuate the purposes of [the authorizing statute], to prevent circumvention or evasion thereof, or to facilitate compliance therewith." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 238-39, 242 (2004) (internal quotation marks omitted). That is precisely what Congress has done in the Clean Air Act in requiring the Administrator of EPA to study and investigate emissions of air pollutants from aircraft and adopt regulations to control them. The Act states that "[t]he Administrator shall, from time to time, issue proposed . . . standards applicable to the emission of any air pollutant from . . . aircraft engines which in his judgment causes, or contributes

to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7571(a)(2)(A). After hearings, the Administrator is authorized to "issue such regulations with such modifications *as he deems appropriate*." *Id.* § 7571(a)(3) (emphasis added). This delegation of authority is both explicit and extraordinarily broad. *See Atkins v. Rivera*, 477 U.S. 154, 162 (1986) (finding an express delegation of authority where "Congress conferred on the Secretary exceptionally broad authority to prescribe standards for applying certain sections of the Act") (internal quotation marks omitted). Accordingly, because Congress has "explicitly left a gap for the agency to fill, the agency's regulation is given controlling weight unless [it is] . . . manifestly contrary to the statute." *Household Credit Servs.*, 541 U.S. at 239 (internal quotation marks omitted).

NACAA argues that the Final Rule's interpretation of § 231 to allow codification of current practices rather than requiring a technology-forcing approach is inconsistent with CAA's "forward-looking language [and] . . . overall purpose and legislative history" and "renders meaningless" § 231's reference to technology. Petitioner's Br. at 17-23. Petitioner's logic is simple. Although the Final Rule tightens EPA regulations by 16%, almost all aircraft already satisfy this requirement by virtue of their compliance with ICAO standards. Since § 231 is intended to promote the "public health [and] welfare," *see* 42 U.S.C. § 7571(a)(2)(A), not to "establish[] consistency with international standards," EPA must require use of new technology to effect even greater emissions reduction. Petitioner's Br. at 21. Following this logic, NACAA argues that "EPA's determination that safety considerations were as important as the overall goal of promoting public health and welfare is inconsistent with the Act and an unreasonable interpretation of section 231." *Id.* at 26. And NACAA contends that § 231 only permits EPA to consider compliance costs where the standard ultimately issued would require development of

new technology. *Id.* at 30-31. In other words, NACAA reads § 231 to focus primarily upon emissions reduction and to give all other concerns – including international standards, safety concerns, and compliance costs – a subsidiary role. The bottom line, according to NACAA, is that the Final Rule impermissibly interprets § 231 to permit EPA to promulgate a rule that will not actually effect an emissions reduction.

The Final Rule announces a different view of the statutory scheme. It first notes that other provisions of the CAA require EPA to obtain the "greatest degree of emission reduction achievable." *See* Final Rule, 70 Fed. Reg. at 69,676 (quoting 42 U.S.C. § 7547(a)(3)). But § 231 does not contain such language. Thus, the Final Rule reasons, EPA "is not required to achieve a 'technology-forcing' result" in the aircraft engine emissions context. *Id.* Nor does the Final Rule "interpret the Act as requiring the agency to give subordinate status to factors such as cost, safety, and noise." *Id.* Rather, it concludes that EPA "has greater flexibility under section 231 in determining what standard[s are] most reasonable for aircraft engines." *Id.* The Final Rule also notes that "there is an added emphasis [in § 231] on the consideration of safety. Therefore, it is reasonable for EPA to give greater weight to considerations of safety in this context than it might in balancing emissions reduction, cost, and energy factors under other [CAA] provisions." *Id.* (internal citations omitted).

"[W]e need not find that [this interpretation] is the only permissible construction that EPA might have adopted but only that EPA's understanding of this very complex statute is" not manifestly contrary to the CAA. *Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 125 (1985) (internal quotation marks omitted). When Congress enacted § 231 providing that the Administrator could, "from time to time," act "in his judgment," as "he deems appropriate," it conferred broad discretion to the Administrator to weigh various factors in

arriving at appropriate standards. Moreover, to the extent that § 231 requires rules promulgated thereunder to tighten emission standards, the Final Rule in fact does so by 16%. NACAA's argument that § 231 additionally requires a technology-forcing result and prohibits consideration of such factors as safety and compliance costs is a familiar one. In *George E. Warren Corp. v. EPA*, the petitioners argued that "the maintenance or improvement of air quality is the sole focus of the anti-dumping provision [of the CAA]." 159 F.3d 616, 623 (D.C. Cir. 1998). Finding nothing in "the text or structure of the statute to indicate that the Congress intended to preclude the EPA from considering [factors other than air quality]," we refused "to infer from congressional silence an intention to preclude the agency from considering factors other than those listed in a statute." *Id.* at 623-24; *see also Allied Local*, 215 F.3d at 78; *George E. Warren Corp.*, 159 F.3d at 623-24 ("'In the absence of clear congressional direction to the contrary, we will not deprive the agency of the power to fine-tune its regulations to accommodate worthy nonsafety interests' under a statute focused upon safety." (quoting *Int'l Bhd. of Teamsters v. United States*, 735 F.2d 1525, 1529 (D.C. Cir. 1984))).

Congress has delegated expansive authority to EPA to enact appropriate regulations applicable to the emission of air pollutants from aircraft engines. Because we find that the Final Rule is not "manifestly contrary to the statute," it must be given controlling weight. We therefore defer to EPA's construction of § 231.

**D.** *Arbitrary and Capricious Review*

NACAA also contends that the Final Rule is arbitrary and capricious under four different theories. However, "[i]t is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst.*, 373 F.3d at 1297-98 (citing *United States v. L.A. Tucker Truck Lines,*

*Inc.*, 344 U.S. 33, 37 (1952)). Indeed, the CAA specifically provides that "only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." 42 U.S.C. § 7607(d)(7)(B). Objections must be prominent and clear enough to place the agency "on notice," for EPA is not required "to cull through all the letters it receives and answer all of the possible implied arguments." *Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1240 (D.C. Cir. 2004). Petitioners who fail to comply with this exhaustion requirement are barred from seeking judicial review. *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 891 (D.C. Cir. 2006). Under this standard, NACAA has forfeited three of its arguments by failing to raise them "with reasonable specificity" in the proceedings before EPA.

Petitioner first claims that the Final Rule relies upon an improper factor when it cites insufficient time as the primary justification for not issuing more stringent standards. NACAA's argument is clear: since EPA "had complete discretion over the timing of the rule" and thus caused the delay itself, it is barred from relying upon shortage of time to support the Final Rule's limited stringency. Petitioner's Br. at 23-24. Not only did petitioner not raise this argument before EPA, it acknowledged the opposite. Before EPA, the organizations that later joined to form NACAA stated:

> [We] are disappointed that EPA waited as long as it did to align U.S. aircraft standards with those of the international community. . . . However, given the inexplicable delay, EPA is now accurate to assert, as it does in this untimely proposal, that "at this time, there is not sufficient lead time to require more stringent emission standards . . . ." Nonetheless, our associations firmly believe that EPA has an obligation to immediately follow this rulemaking with further, more aggressive regulatory action . . . .

Comments of STAPPA/ALAPCO, 12/15/03, *reprinted in* Joint Appendix ("J.A.") 247, 249. NACAA understood that, in aligning U.S. aircraft standards with those of the 1999 ICAO standards, EPA did not have sufficient lead time to require more stringent emission standards. NACAA voiced its disappointment, but it did not claim that EPA was tardy in considering further regulatory action. Rather, petitioner merely asked that EPA "follow this rulemaking with further, more aggressive regulatory action." Because NACAA did not raise a claim for unreasonable delay with the agency, *see generally Sierra Club v. Thomas*, 828 F.2d 783, 794-97 (D.C. Cir. 1987), the challenge is not properly before the court.

NACAA is also foreclosed from raising a claim that the Final Rule is arbitrary and capricious because "EPA issued the rule as 'a near-term approach' without firmly committing to future action." Petitioner's Br. at 31. The Final Rule states, "EPA intends to address more stringent emission standards requiring more lead time in a future rulemaking." 70 Fed. Reg. 69,674. Before EPA, NACAA did not object to this course of action and did not argue that EPA must actually schedule a future rulemaking in the Final Rule. NACAA only asked EPA to "follow this rulemaking with further, more aggressive regulatory action." Comments of STAPPA/ALAPCO, *reprinted in* J.A. 249. Accordingly, we will not consider this argument on the merits.

Finally, NACAA contends both that safety is an improper factor under § 231 and that "EPA never explained *why* safety considerations prevented it from issuing . . . standard[s] that would require the development and application of technology." Petitioner's Br. at 27. This argument was also forfeited. NACAA concedes that it did not object before the agency, but argues that this failure should be excused, because EPA's notice of proposed rulemaking did not mention safety concerns. But even where "the ground for [an] objection arose after the period

for public comment, . . . the petitioner must first seek a proceeding for reconsideration. Only then may petitioner seek judicial review." *Appalachian Power Co.*, 249 F.3d at 1055 (internal quotation marks and citation omitted).

The fourth claim raised by NACAA – that EPA does not adequately explain its refusal to extend the 16% reduction to newly manufactured engines of already certified models – is properly before the court on the merits. Although this claim was properly preserved, it lacks merit. The Final Rule acknowledges that EPA has "historically adopted production cut-offs," but it then distinguishes this "unique case." 70 Fed. Reg. at 69,681. The Final Rule explains that since ICAO did not apply its 1999 standards to newly manufactured engines, application of those standards "could be disruptive to the production planning of engine manufacturers," *id.* at 69,678, 69,680-81, and would require analysis of "the emissions benefits (if any) and the implementation costs of [wider applicability]," *id.* at 69,681. Because EPA did not have time to investigate these possible compliance costs, the agency elected not to impose a production cut-off date. It is settled law that an agency may change its past practices, especially under changed circumstances, so long as it provides a reasoned explanation for its action. *See Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006). Since we have already rejected NACAA's only retort – that cost compliance is an improper factor – we conclude that the Final Rule's deviation from past practice is supported by reasoned decisionmaking warranting our deference.

## III. CONCLUSION

For the reasons set forth above, the petition for review is hereby denied.

*So ordered.*